IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HOLLY WALKER, individually, and CAROL PARADISE, individually and on behalf of all others similarly situated, and on behalf of the general public,<br><br>                     Plaintiffs,<br><br>    v.<br><br>BANKERS LIFE & CASUALTY COMPANY, an insurance company domiciled in the State of Illinois; and DOES 1 to 100,<br><br>                     Defendants. | Civil Action No. 06 C 6906<br><br>Suzanne B. Conlon, Judge |

## MEMORANDUM OPINION AND ORDER

In this diversity case, Holly Walker and Carol Paradise (collectively, "plaintiffs") sue

Bankers Life & Casualty Company ("Bankers Life") for violations of California Labor Code §

2802, California Civil Code §§ 3336 and 3294, California Unemployment Insurance Code

Sections §§ 1112(a), 1112.5 and 1113, and California Business and Professions Code §§ 17200,

*et seq.* Walker brings her claims individually. Paradise brings her claims on behalf of herself

and a class of California insurance agents ("agents"). They claim Bankers Life misclassified its

California agents as independent contractors rather than employees, and denied them rights and

benefits required under California law. The following class of agents was certified on October 1,

2007:

> All persons who entered into an Agent Contract with Defendant and were
> appointed to work as an Agent of Defendant in California and who were classified
> by Defendant as independent contractors, from September 18, 2002 to the
> conclusion of this action.

*Walker v. Bankers Life & Cas. Co.*, No. 06 C 6906, 2007 WL 2903180 (N.D. Ill. Oct. 1, 2007).

Plaintiffs move for summary judgment as to liability, arguing that Bankers Life misclassifies its agents as independent contractors. Bankers Life moves to decertify the class. For the reasons stated below, plaintiffs' motion for summary judgment is denied and Bankers Life's motion to decertify the class is granted

## I.  BACKGROUND FACTS

The following facts are undisputed unless otherwise noted.[1]  Bankers Life is an Illinois insurance company authorized to sell various forms of insurance in California. Def. Resp. ¶ 2. Their products are marketed primarily to senior citizens, and are sold by agents who comprise a sizable part of their sales force. *Id.* For at least the last 29 years, Bankers Life has classified its agents as independent contractors. Def. Facts ¶ 6. There are more than 2,482 people who have worked as Bankers Life agents during the class period. Pls. Facts ¶ 1. Walker is a California citizen who was a Bankers Life agent from 1998 until February 2006. *Id.* It is undisputed that California law applies to the resolution of this diversity case.

### A.  The Agent Contract

The relationship between Bankers Life and its insurance agents is governed by a non-negotiable form contract, which includes the following terms:

- The contract shall not create an employer-employee relationship. The relationship of Agent to Bankers Life shall be that of independent contractor.

- The Agent agrees to abide by all policies, practices and procedures adopted by

---

[1]Bankers Life objects to Paradise's L.R. 56.1 statement because many of her paragraphs contain multiple facts and/or bullet points in contravention of L.R. 56.1's requirements. L.R. 56.1 ("[L.R. 56.1] statement . . . shall consist of [80] short numbered paragraphs"). Bankers Life's objections are noted.

[Bankers Life].

- The authority given in the contract is subject to provisions and limitations contained [in the contract] and in [Bankers Life's] manual, rate books, rules and regulations.

- The Agent shall promote the interest of [Bankers Life] as contemplated by [the contract].

- While the contract is in effect, the Agent has the authority to:

  - solicit applications for insurance policies to be issued by [Bankers Life] and payments made thereon, and issue receipts for the monies collected,
  - deliver policies issued by [Bankers Life] on applications received, if the first premium has been paid,
  - give service to policy holders to maintain the policies in force,
  - solicit applications for reinstatement of lapsed policies.

- No act of forbearance or toleration on the part of Bankers Life in favor of the Agent in respect to provisions of [the contract], either express or implied shall be construed as a waiver by [Bankers Life] of any of its rights.

- Either party may terminate [the contract] at will, without cause, by giving notice to the other party of the intention to terminate. No notice period is required to terminate the contract.

- No promotional material or [advertising in any form] shall be made . . . without [Bankers Life's] prior consent.

- The Agent agrees to hold all names, policyholder cards, contact data and customer list in a fiduciary capacity and agrees not to divulge names, policyholder cards or other contact data to any other Company, agency or person. The Agent agrees to return all rate information, sales manuals, forms, policyholder cards, contact data, and customer lists to [Bankers Life] upon demand or upon termination.

- During the term of [the contract] and for 24 months thereafter, within the territory regularly serviced by the branch sales office of [Bankers Life] where the Agent normally submits business, the Agent shall not . . . induce or attempt to induce . . . any agent, branch sales manager, divisional vice president or employee of [Bankers Life] to contract with or sell insurance business with any company not affiliated with [Bankers Life].

3

Pls. Facts ¶¶ 6, 42, 57, 64. The contract does not specify a term for which it runs. *Id.* ¶ 65.

## B.    Agent Commissions and Minimum Production Requirements

Agents are paid by commission for each insurance policy they sell or renew. Commission rates are set forth in a Uniform Commission Schedule, which also provides minimum production requirements for agents. *Id.* ¶ 7. It is disputed whether agents can be terminated for not meeting minimum production requirements. Def. Resp. ¶¶ 7-8. A Bankers Life internal memorandum indicated that agents not meeting minimum production requirements were subject to termination. Pls. Facts ¶ 8. However, some agents have testified that minimum production requirements are not enforced at their respective branches. Def. Resp. ¶¶ 7-8. In addition to minimum production requirements, the Uniform Commission Schedule provides that "[Bankers Life] shall have the right of first refusal on all business produced by the Agent." Pls. Facts ¶ 52. The only requirement to become an agent is to be willing to be licensed by the California Department of Insurance. *Id.* ¶ 9.

## C.    Bankers Life Training Programs, Policies, and Publications

Bankers Life provides agents free training programs. These include "New Agent Success" and the "Winners Edge" program. Pls. Facts ¶¶ 10, 22. A third program, "Compliance as a Competitive Edge," was implemented in October 2005. *Id.* The "New Agent Success" program provides 42 hours of classroom time, and offers agents a detailed sales script and a six-step sales model. *Id.* ¶¶ 15-16. "Compliance as Competitive Edge" and "Winners Edge" also provide sales training, including "do's and don't's" with respect to the sales model, as well as role playing type training. *Id.* ¶¶ 19-20. Additionally, a section in the "Compliance as

4

Competitive Edge" states:

> The Bankers' Agent Contract is an exclusive contract; You cannot have multiple company contracts; You cannot sell insurance for another broker or dealer while you are selling insurance for Bankers; You cannot have non-insurance business contracts; Bankers does not have part time agents. Meeting sales goals and providing Bankers' required level of client service demands your full-time application of time, energy, and attention.

*Id.* ¶ 53. Notwithstanding this statement, it is disputed whether all agents are instructed that they cannot work for other insurers. Def. Resp. ¶ 53. Some agents hold multiple appointments with various insurance carriers, sometimes without Bankers Life's permission. Def. Resp. ¶¶ 53-55. Bankers Life provides additional training materials for each of its products. Pls. Facts ¶ 12. But whether agents have participated in Bankers Life's product training prior to selling certain products is disputed, as some agents have not attended this training. Def. Add. Facts ¶ 7.

It is disputed whether agents must follow the Bankers Life's sales model or other sales training techniques. Def. Resp. ¶¶ 16, 20. Some agents develop their own sales techniques. *Id.* Some agents also bypass using Bankers Life's sale scripts. Def. Resp. ¶ 36. It is disputed whether Bankers Life directs its agents to complete all training courses and whether Bankers Life monitors each agent's training. Def. Resp. ¶ 11. Although Bankers Life has a goal that all agents complete training programs (nearly all of them complete some form of training), several agents have testified they are not required to attend training sessions, and several have also admitted they take training courses not offered by Bankers Life. *Id.* ¶¶ 11, 22; Pls. Facts ¶ 14.

Bankers Life provides agents with sales brochures, email and phone services, application forms, office space, telephones, computers and other office equipment. Pls. Facts ¶¶ 32, 35.

However, agents purchase their own office supplies, personal computers, business cards, postage, mileage, and support staff if desired. Def. Resp. ¶ 32. Agents deduct these costs as business expenses on their tax returns, they are treated as independent contractors for all income and employment tax purposes, and they have completed proprietorship schedules to their individual federal income tax returns. Def. Facts ¶ 19.

Bankers Life issues its agents an extensive, regularly updated 161-page resource called an "Agent Information and Procedures Manual." Pls. Facts ¶¶ 25-26. This manual is a resource providing agents with information regarding, *inter alia*: compensation, marketing and advertisement guidelines, sales rewards programs, administrative procedures with respect to delivering policies, scope of ethics, guidelines in how to address and sell to seniors, billing systems, policy-related information, and minimum standard requirements. *Id.* Changes to these procedures are sent to agents via "Field Compliance Alerts." *Id.* ¶ 27.

Bankers Life publishes for agents additional manuals and materials, including a 227-page "Project 15 Bankers Sales Success Handbook," a "New Agent Success Handbook," and an "Agents Quarterly" *Id.* ¶¶ 28, 30-31. The company maintains a "Sales Portal Network," an online resource tool that helps track agent sales. *Id.* ¶ 29. Bankers Life's Field Development Manger, Allen Castiglia, meets personally with agents to discuss their performance, knowledge, and skills regarding their work for Bankers Life. *Id.* ¶ 45.

## D.     Client Development and Solicitation

In developing clients, Bankers Life freely provides agents with leads to potential customers. Pls. Facts ¶ 34. Some have testified that branch sales managers only give leads at branch meetings to enforce meeting attendance or only give leads to agents meeting productivity

6

standards. *Id.* However, others have testified that agents are free to generate leads however they choose. Def. Resp. ¶ 34. Some even purchase their leads from independent sources. *Id.* Leads may also be paid for through a field support program at branches. Pls. Facts ¶ 71.

Bankers Life has a Gryphon telephone system in place, which records and generates reports on agent call activity and whether sales appointments are set. *Id.* ¶ 37. According to Bankers Life, the Gryphon system allows the company to ensure compliance with federal "Do Not Call" lists. Klein Dep. at 69. Whether agents are required to use the Gryphon system to telephone clients is disputed, as some do not use it when making sales appointment calls. Def. Resp. ¶ 37. Agents use telemarketers. But if an agent does use a telemarketer, the person should be approved by Bankers Life, employed and paid through an approved employment agency. Pls. Facts ¶ 43.

Bankers Life provides testimony that some of its training regarding advertising, prohibited discrimination, and required disclosures is required by California law. Def. Facts ¶¶ 37-39. Similarly, they advance testimony indicating that requirements for approval for advertising and scripts are to ensure compliance with California law. Def. Facts. ¶¶ 39-41.

### E.   Bankers Life Branch Offices

Bankers Life branch sales managers oversee agents and undergo training with respect to running individual branch offices. *Id.* ¶ 47. Part of their training includes a "Boot Camp" in Chicago and "1 year Agent Track" training, where the managers are trained to review with agents phone advertisement procedures, sales models, business training, and to oversee agent training and development. *Id.* ¶ 48. Whether branch sales managers do so in practice is disputed, as there is testimony that some branch managers have discretion to run their branches

7

as they see fit. Def. Resp. ¶ 48.

Branch offices hold training or "sales builder" meetings. Pls. Facts ¶ 21. In some branches, agents have been fired, fined, and reprimanded for missing meetings. *Id.* ¶ 74. In others, agents suffer no negative repercussion for missing meetings at their branch offices. Def. Resp. ¶ 74. Agents have testified they are free to set their own hours and work schedules, and some work on a part-time basis mostly from home. Pls. Facts ¶¶ 10-11, 15. Others have testified they hold second jobs while associated with Bankers Life, such as teaching high school, playing in a local orchestra, and managing a restaurant. *Id.* ¶ 14.

Branch sales managers and unit sales managers are Bankers Life employees. Their contracts are identical to the agent contract in that they limit employees' authority and affirm that all sales materials belong to Bankers Life. Pls. Facts ¶ 77. A difference is that an agent's authority is "subject to the provision and limitations contained [in the contract], and in [Bankers Life's] manual, rate book, rules and regulations. . ." *Id.* The commission rates for an agent selling a policy is the same as for an employee selling the same policy. *Id.* ¶ 78.

Bankers Life secures an errors and omissions insurance policy for its agents to purchase. Pls. Facts ¶ 46. Some agents purchase their own insurance policy independently of Bankers Life. Def. Resp. ¶ 46.

F.    **Termination and Tenure**

Upon termination, it is unclear whether agents receive residual compensation on existing policies and renewals, or whether agents can sell their book of business. Def. Resp. ¶ 56. However, an agent is required to return all customer lists and contact information to the company. Pls. Facts ¶ 58. Agents cannot solicit their former clients after leaving Bankers Life.

8

*Id.* ¶ 61. If a policyholder no longer has an agent with Bankers Life, another agent is given the opportunity to service that policyholder without compensation. *Id.* ¶ 70.

The average tenure for an agent under contract with Bankers Life is approximately one year, but some have continued the relationship for 20 years. Pl Facts ¶ 66. After an agent works for Bankers Life for seven years, they are deemed vested; after 10 years they are deemed fully vested. *Id.* ¶ 67. Those who are deemed "career agents" are eligible to receive benefits not otherwise available, including a deferred compensation plan. *Id.* ¶ 68. However, career agents do not receive sick leave, vacation days, 401(k) plan eligibility, a company car, mileage reimbursement or any other reimbursement associated with the sale of insurance. Def. Resp. ¶ 68.

## II.    PLAINTIFFS' SUMMARY JUDGMENT MOTION

### A.    Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007). A genuine issue of material fact exists when, in viewing the record and all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). The movant has the burden of establishing there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies this burden, the non-movant must set forth specific facts demonstrating a

9

genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

## B.    Misclassification

The principal test of an employment relationship is whether the person to whom service

is rendered has the right to control the manner and means of accomplishing the result desired.

*See S.G. Borello & Sons, Inc. v. Dept. Of Indus. Relations*, 48 Cal. 3d 341, 350 (Cal. 1989)

(quoting *Tieberg v. Unemployment Ins. Appeals Bd.*, 2 Cal. 3d 943, 946 (Cal. 1970)). Courts

recognize "several 'indicia' of the nature of a service relationship" including whether an

employer has "the right to discharge at will, without cause." *Id.* at 350-51. Other secondary

factors, derived principally from the Restatement Second of Agency § 220, include:

> (a) whether the one performing services is engaged in a distinct occupation or
> business; (b) the kind of occupation, with reference to whether, in the locality, the
> work is usually done under the direction of the principal or by a specialist without
> supervision; (c) the skill required in the particular occupation; (d) whether the
> principal or the worker supplies the instrumentalities, tools, and the place of work
> for the person doing the work; (e) the length of time for which the services are to
> be performed; (f) the method of payment, whether by the time or by the job; (g)
> whether or not the work is a part of the regular business of the principal; and (h)
> whether or not the parties believe they are creating the relationship of
> employer-employee.

*Id.* "Generally, . . . the individual factors cannot be applied mechanically as separate tests; they

are intertwined and their weight depends often on particular combinations." *Id.* (citation and

quotation omitted). "The label placed by the parties on their relationship is not dispositive, and

subterfuges are not countenanced." *Id.* at 349.

It is Bankers Life's burden to show that plaintiffs are independent contractors rather than

employees. *See Desimone v. Allstate Ins. Co.*, No. C 96-03606, 2000 WL 1811385, at *10 (N.D.

Cal. 2000) (citing *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 608 n. 6 (Cal. Ct.

10

App. 1989)). The determination of whether one is an employee or independent contractor is a matter of law when the material evidence is undisputed. *Id.* (citing *S.G. Borello*, 48 Cal.3d at 349).

## C. Analysis

Plaintiffs argue the undisputed facts show that Bankers Life agents are misclassified as independent contractors. Bankers Life counters that genuine issues of fact preclude summary judgment because many agents have particular circumstances that demonstrate they are properly characterized as independent contractors. Because the classification question turns on resolution of disputed evidence or inferences, plaintiffs' motion must be denied.

### 1. Right to Control Agents

There is a factual dispute whether Bankers Life has the right to control how agents sell the company's insurance products. Plaintiffs claim Bankers Life possesses a right to control its agents because the agent contract and the company's published policies, procedures, manuals, and training materials manifest that the right exists. For example, plaintiffs assert the agent contract has provisions dictating that Bankers Life can control the manner in which agents sell insurance policies. These include: a provision indicating an agent's authority is subject to Bankers Life's manual, rate books, rules and regulations; a provision reserving Bankers Life's rights should agents fail to abide by the contract; a provision requiring that an agent seek approval prior to advertising; a provision that agents hold the company's proprietary information in a fiduciary capacity; and finally, a non-competition provision. Pls. Facts ¶¶ 6, 42, 57, 64. The agent contract states that agents should "abide by all policies, practices, and procedures adopted by" Bankers Life. *Id.* Bankers Life argues these provisions, in addition to the policies and

11

procedures in Bankers Life's training/publication materials, establish a right to control the manner in which agents sell insurance policies.

This evidence supports an inference that Bankers Life has the right to control the way its agents sell its products. But there is competing evidence that raises a disputed issue concerning the right to control. The agent contract and an agent manual explicitly state that agents are independent contractors. Bankers Life proffers evidence that agents maintain freedom and autonomy in their work as salespersons. Contrary to plaintiffs' assertion that agents are "required" to follow certain sales methods in Bankers Life's training programs, agents testified they can implement their own sales techniques and are free to pursue individual lead generation methods. Pls. Facts ¶ 8. Agents can set their own hours, and their schedules vary, depending on the individual. *Id.* ¶ 10. There is testimony that agents may sell insurance for Bankers Life on a part-time basis, working only a few days a week and engaging in other occupations during their time off from Bankers Life work. *Id.* ¶ 11. There is evidence that agents can work primarily from home, and some rarely come into any branch office. *Id.* ¶ 15. These individual agent experiences, viewed in a light most favorable to Bankers Life, raise a reasonable inference that agents are independent contractors who freely control how they sell Bankers Life products to customers.

Plaintiffs' assertion that Bankers Life training program and materials demonstrate a right to control an agent is a disputed issue. Bankers Life provides testimony that some of its training regarding advertising, prohibited discrimination, and required disclosures are required by California law. Def. Facts ¶¶ 37-39; *see, e.g., Desimone*, 2000 WL 1811385, at **12-13 (training requirements for insurance agents did not indicate right to control plaintiffs business

because the training was meant to comply with state and federal law). Bankers Life submits that California regulations require it to provide agents "thorough and adequate" training regarding regulations that set forth guidelines for issues including the form and content of advertising, prohibited discrimination, and required disclosures. *See* Cal. Code Regs. § 2695.6; Cal. Ins. Code § 1749.8; Def. Facts ¶ 37. Therefore, Bankers Life's training system is not preclusive evidence of a right to control the manner by which agents sell insurance policies.

There is evidence that agents are free to sell insurance in methods not prescribed in the training materials. Def. Resp. ¶¶ 16, 20. Some agents testified that they have chosen not to even attend Bankers Life training, opting instead to train themselves or receive training from unaffiliated third parties. *See* Def. Resp. ¶ 11. Some agents testified they are not required to take any training. Def. Resp. ¶ 11. Additionally, some agents testified that they do not use some of the forms that plaintiffs claim are required in selling Bankers Life insurance products. Pls. Facts ¶¶ 31-35. Therefore, for these particular agents, the training materials are not probative evidence of whether Bankers Life has the right to control them.

There is a disputed issue of fact regarding whether agents were "captive" and were instructed that they could not work for other insurers. Although Bankers Life's training materials state that the agent contract is an "exclusive" one, agents testified that they maintained appointments to sell for other insurance companies while under contract with Bankers Life. Def. Resp. ¶ 53. Plaintiffs contend Bankers Life had a uniform policy requiring termination of agents who sold for other insurers, but there are a number of agents who testified that they held appointments with other insurers while under contract with Bankers Life, at times with Bankers Life's permission. *Id.* ¶ 54. These instances create a genuine issue of disputed fact regarding

13

whether Bankers Life categorically refuses to allow agents to work for other insurers.

## 2. *Additional Common Law Factors*

A proper balancing of California's common law factors cannot be made as a matter of law because disputed factual issues exist. For example, a significant factual dispute remains regarding whether Bankers Life provides agents the "instrumentalities, tools, and the place of work" to show they are employees rather than independent contractors. *See S.G. Borello*, 48 Cal. 3d at 350-51. Bankers Life provides sales brochures, application forms, and other materials used by agents, but agents also provide for themselves materials used in selling Bankers Life products – namely, telemarketers, the cost of licensing, the cost of office supplies, and gas. *See* Def. Resp. ¶ 33; Pls. Facts ¶ 18. These costs and expenses are deducted by agents as business expenses on tax returns. Def. Facts ¶ 19. A reasonable inference can therefore be drawn that while Bankers Life provides product and administrative materials to agents, agents still invest in their work materials as independent contractors. *See, e.g., Desimone*, 2000 WL 1811385, at *16 (tax treatment as independent contractor weighed in favor of that classification).

It is unresolved whether a Bankers Life agent's occupation is "usually done under the direction of a principal or by a specialist without supervision." *See S.G. Borello*, 48 Cal. 3d at 350-51. Although there is evidence that agents receive specialized training and that their production may be monitored, Pls. Facts ¶¶ 8, 29, some evidence suggests that little supervision is required over the actual selling aspect of the job. Some agents freely manage their own schedules, use their own sales techniques, develop their own leads, and work mostly from home. Def. Facts ¶¶ 8, 10-11. The inferences from this evidence can be drawn either way. Viewing the reasonable inferences in Bankers Life's favor, plaintiffs' motion for summary judgment on this

14

ground is unwarranted.

Similarly, there is a disputed issue regarding the "skill required for the occupation" and "the length of time for which the services are to be performed." The only requirement for becoming an agent is that he be willing to be licensed. Pls. Facts ¶ 9. Bankers Life argues that state licensing requirements buttress an independent contractor classification because obtaining a state license constitutes evidence of requisite skill. *See Shweiger v. Farm Bureau Ins. Co.*, 207 F.3d 480, 485 (8th Cir. 2000) (licensing weighed heavily in favor of independent contractor). State licensing is a threshold requirement for becoming an agent in California. A reasonable inference may be drawn that Bankers Life's agents are independent contractors licensed by the state.

The agent contract does not set forth a specified time limit. Plaintiffs argue this indeterminate time limit connotes an employment relationship because an agent can work for Bankers Life as long as he wishes. However, Bankers Life proffers evidence that the average tenure for an agent under contract with Bankers Life is about one year. The facts that the contract does not set forth a specified time limit and contains a mutual termination provision do not preclude a finding that agents are independent contractors. While courts have recognized that the right to terminate a contract at will or without cause is evidence of an employment relationship, a mutual termination provision may be construed as a continuing contractual relationship between parties. *See, e.g., Desimone*, 2000 WL 1811385, at *15. (citing *State Compensation Ins. Fund v. Brown*, 32 Cal. App. 4th 188, 203 (Cal. Ct. App. 1995). Drawing all reasonable inferences in Bankers Life's favor, this factor does not support plaintiffs' summary judgment motion.

15

There is evidence to support plaintiffs' contention that agents are misclassified. But there is conflicting testimony that suggests agents are independent contractors. There are disputed issues of material fact about Bankers Life's right to control its agents. Summary judgment is therefore not appropriate.

## III.    BANKERS LIFE'S MOTION TO DECERTIFY THE CLASS

### A.    Decertification

The court has broad discretion in determining whether class certification is proper. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998). The court's initial determination to certify a class is "inherently tentative," and the court "remains under a continuing obligation to review whether proceeding as a class is appropriate." *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 419 (N.D. Ill. 2003) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.11 (1978)); *see also Binion v. Metro. Pier and Exposition Auth.*, 163 F.R.D. 517, 520 (N.D. Ill. 1995) (court "remains free to modify or vacate a certification order if it should prove necessary"). In deciding a motion to decertify a class, the court tests whether economy favors adjudicating multiple disputes in a single action, without sacrificing fairness. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 155 (1982) (citation omitted). If certification is later deemed improvident at any time during the course of litigation, a court may decertify the class. *See, e.g., Eggleston v. Chicago Journeymen Plumbers' Local No. 130*, 657 F.2d 890, 896 (7th Cir. 1981); *see also Ellis*, 217 F.R.D. at 419; Fed. R. Civ. P. 23(c)(1)(C) ("order that grants . . . class certification may be altered or amended"). Plaintiffs bear the burden of producing a record demonstrating the continued propriety of maintaining the class action. *Ellis*, 217 F.R.D. at 419 (citation omitted).

### B.    Analysis

16

The court's initial certification decision was entered when the parties completed limited discovery. Since certification, more than 30 class members have been deposed and discovery is now complete. Bankers Life argues class decertification is appropriate because it has become apparent that common questions will not predominate over individual ones and the class action device is not a superior method for adjudication. *See* Fed. R. Civ. P. 23(b)(3). The court agrees.

Disputed factual issues preclude summary judgment because the common question of whether Bankers Life misclassifies its agents is still an open one. Common evidence of the agent contract and other Bankers Life policy and training manuals are insufficient to resolve plaintiffs' claim. To the contrary, resolving the common issue of misclassification would require an onerous inquiry into each agent's relationship with Bankers Life because individual circumstances inform application of the *S.G. Borello* multifactor test. Liability determinations would be individual and fact-intensive, rendering class certification under Rule 23(b)(3) is improper. *See, e.g., Rodriguez v. Ford Motor Credit Co.*, No. 01 C 8526, 2002 WL 655679, at *5 (N.D. Ill. Apr. 18, 2002) (Conlon, J.).

### 1. **Predominance**

Paradise contends the uniform, identifiable treatment of Bankers Life agents establishes that common issues predominate over individual issues. She points to the court's previous order, which identified certain clauses in the agent contract and various Bankers Life policies that presented a broad picture of the type of evidence likely needed to resolve the class claims. *See Walker*, 2007 WL 2903180, at **7-10. However, the evidence now before the court crystalizes the fact-specific nature of the relationship between Bankers Life and each class member, and reveals that individual issues must be resolved to adjudicate Paradise's misclassification claim.

17

The right to control test is not to be viewed in isolation, as there are several indicia of the relationship, which are not to be applied mechanically. *See S.G. Borello* , 48 Cal. 3d at 350. Bankers Life argues the record now reflects that its liability will turn on an individualized factual inquiry into each class member's relationship with the company. The company contends this is true because the principal factor in considering whether agents are misclassified is whether Bankers Life controls an agent's work. Def. Mem. at 4. In support, the company proffers a voluminous compendium of supporting depositions, declarations, and sworn summaries outlining various agent working conditions. *See* Def. Mem. at 4-7. This evidence includes differences among agents with respect to work hours, training attendance and requirements, sales builder meeting attendance and requirements, phone clinics and appointments, lead generation, marketing procedures, use of scripts and standardized forms, performance reviews, work supplies, and company appointments. *Id.* Additionally, Bankers Life argues its fifteen California branch offices use various policies and procedures that impact the extent of control the company exerts over agents. *See* Def. Compendium Tab 37. There is testimony that in each office, training varies, as do clinics, best practices, and employee monitoring. *Id.* at Tabs 37-45. Bankers Life indicates that sometimes agents based out of the same branch (managed by the same branch manager) are afforded different levels of freedom in attending training sessions, phone clinics, utilizing certain sales strategies, or giving up appointments with other insurance companies. *See* Def. Mem. at 8. Bankers Life argues these divergent experiences demonstrate it is impossible to determine on a class-wide basis whether the company uniformly controls its agents or whether they should be considered employees on a class-wide basis.

Paradise responds that most of Bankers Life's evidence is identical to that previously

18

considered by the court when certification was granted. Bankers Life proffers a number of the same summaries and declarations. Paradise contends the evidence is still insufficient to warrant decertification because it "merely shows occasional instances of deviation from Bankers' expectations or policies and does not show that [Bankers Life] relinquished the right to control the agents." Pl. Mem. at 1. These arguments are unpersuasive.

First, Paradise's argument that the court should not consider evidence of *actual* control because the proper test is the *right* to control is unavailing. *See SG Borello*, 48 Cal. 3d at 350 (principal test is "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired"). Although courts use the "right to control" language as the proper standard, courts also look at actual control in analyzing whether an employment relationship exists under the multifactor test established by California law. *See, e.g., Tieberg*, 2 Cal. 3d at 952 (trial court properly found that director in fact exercised control and direction over writers); *S.G. Borello*, 48 Cal. 3d at 356 (grower of agricultural crops exercised "pervasive control over the operation as a whole"); *Air Couriers Int'l v Employment Development Dept.*, 150 Cal. App. 4th 923, 937 (Cal. Ct. App. 2007) (trial court properly considered extent to which company controlled drivers). Indeed, the right to control is not the only element in determinating whether an employment relationship was created. *Tieberg,* 2 Cal. 2d at 950. An analysis of the underlying relationship is essential, to analyze whether an employer-employee relationship exists. *See id.* at 952-53. The actual exercise of control may be probative of the existence of an employment relationship.

Second, the full discovery record now reflects that a liability determination will require an individualized evaluation of each agent's relationship with Bankers Life. The evidence proffered

19

with respect to plaintiffs' summary judgment motion indicates that whether Bankers Life had the right to control its agents cannot be resolved solely by referring to the agent contract and uniform policy training manuals and publications. It would require scrutiny of each agents' experience with regard to training, monitoring, practices, and requirements on the job. Testimony regarding an agent's work hours, training attendance and requirements, sales builder meeting attendance and requirements, phone clinics and appointments, lead generation, marketing procedures, use of scripts and standardized forms, performance reviews, work supplies, and company appointments would bear on the question of whether an employer-employee relationship exists. For example, Bankers Life provides evidence that agent experiences and expectations depended on different management styles of individual branch managers. *See* Def. Compendium at Tabs 37-45. Individual agents may have had various experiences and expectations with regard to whether they were required to attend training, meetings, phone clinics, or to utilize Bankers Life sales strategies. *See id.* at Tabs 46-55. This type of evidence, viewed in relation to the multiple factor test set of *SG Borello*, 48 Cal. 3d at 350, demonstrates that this case cannot fairly or efficiently be pursued as a class action because individual issues predominate. *Cf. Duffin v. Exelon Crop.*, No. 00 C 0000, 2007 WL 845336, at *7 (N.D. Ill. Mar. 19, 2007) (Conlon, J.) (predominance requirement not satisfied because significant trial time would be devoted to determinating separate liability issues for each individual claim); *Oshana v. Coca-Cola Co.*, 225 F.R.D. 575, 584 (N.D. Ill. 2005) (Conlon, J.); *Pfaahler v. Consultants for Architects*, No. C. 0000, 2000 WL 198888, at *2 (N.D. Ill. Feb. 8, 2000) (Conlon, J.) (independent contractor inquiry required court to make fact-intensive, individual determinations precluding certification of collective FLSA action); *Salazar v. Avis Budget Group, Inc.*, No. 07 C 0064, 2008 WL 2676626, at *5 (S.D. Cal.

20

July 2, 2008) (predominance not satisfied where liability cannot be established without individual trials for each class member).

### 2. *Superiority*

Superiority is established when a class action would achieve "economies of time, effort, and expense," and promote uniformity of decisions without sacrificing procedural fairness. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). The greater the number of individual issues to be litigated, the more difficult it will be for the court to manage the class action. *See Maddock v. KB Homes, Inc.*, 248 F.R.D. 229, 248 (C.D. Cal. 2007) (citation omitted) (superiority requirement not met where individual issues will predominate); *Doe v. Guardian Life Ins. Co. of America*, 145 F.R.D. 466, 476 (N.D. Ill. 1992) (Williams, J.) (same). A class action is not superior to other available methods because of the number of individual issues to be litigated in this case. *See, e.g., id.* The difficulties likely to be encountered in managing the class action substantially outweigh any possible benefits derived from consolidating the plaintiffs' claims. A significant number of distinct factual issues with regard to each agent would be required. For example, the issue regarding whether every one of the more than 2,000 agents are uniformly required to attend training sessions would require substantial inquiry and time. Ultimately, resolving the core issue of whether Bankers Life misclassifies its agents would result in mini-trials that would inhibit efficient resolution of this dispute. Accordingly, the class action device is not a superior method of adjudication. The class must be decertified.

## IV. CONCLUSION

Due to the reasons set forth above, plaintiffs' motion for summary judgment on the issue of whether Bankers Life misclassifies its agents is denied. Bankers Life's motion to decertify the

21

class is granted.

ENTER:

*Suzanne B. Conlon*

Suzanne B. Conlon
United States District Judge

July 28, 2008

22